UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
02-CV-407(JMR/RLE)

County of Mille Lacs et al. )
)
v. ) ORDER
)
Melanie Benjamin et al. )

Plaintiff County of Mille Lacs ("County"), and intervenor, First National Bank of Milaca,[1] ask the Court to declare the legal status of an Indian reservation.[2] The reservation was established by an 1855 treaty between the Mille Lacs Band of Chippewa Indians and the United States of America. Defendants are individual leaders of the Mille Lacs Band of Chippewa Indians. This matter is before the Court on defendants' motion for summary judgment.

I. Background

A brief history of the reservation provides a context for this dispute. In 1837, not far from Fort Snelling, Minnesota, the United States and 12 Chippewa Nation Bands negotiated a treaty under which the Chippewa Bands ceded title to certain upper midwest lands to the United States.

On February 22, 1855, the Minnesota Chippewa entered into

---

[1]The First National Bank of Milaca has intervened as a plaintiff. See Fed. R. Civ. P. 24(a)(2). For purposes of this motion, the Court will refer to the County and the Bank collectively as plaintiffs.

[2]Plaintiffs also ask the Court to strike defendants' supplemental exhibits and affidavits. Because these materials were not used by the Court in rendering its decision, plaintiffs' motion is moot.

FILED 5-7-03
RICHARD D. SLETTEN, CLERK
JUDGEMENT ENTERED ______
DEPUTY CLERK'S INITIALS ______

another treaty, whereby six separate tracts of reservation land were established as a permanent home for the Minnesota Chippewa, including the Mille Lacs Band. The Mille Lacs Band encompassed some 61,000 acres around Kathio, South Harbor, and Isle Harbor townships in Minnesota (hereinafter "the 1855 reservation").

Two additional treaties, 12 Stat. 1249 (1863) and 13 Stat. 693 (1864),[3] are of interest. In 1863, and again in 1864, the Minnesota Chippewa entered into treaties ceding further lands to the United States. Article XII of both treaties provides, "that, owing to the heretofore good conduct of the Mille Lac [sic] Indians, they shall not be compelled to remove [from their reservation to White Earth] so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites."

The treaty terms were not, however, always honored. As stated by the Court of Claims, "[t]he 1863 and 1864 treaties notwithstanding, between 1871 and 1889, 55,976.42 acres of the Mille Lac land were filed against under the public land laws, i.e., homestead and preemption entries were made on over ninety percent of it." Minn. Chippewa Tribe v. United States, 11 Cl. Ct. 221, 225 (1986). On July 4, 1884, to forestall this loss, Congress stayed any patenting or disposal of Mille Lacs land pending further

[3]The 1864 Treaty also earmarked specific tracts of land for Mille Lacs Band leadership.

legislation. See Ch. 180, 23 Stat. 76, 98 (1884). In 1889, not long thereafter, Congress passed the Nelson Act, which applied the policies of the General Allotment Act to the Chippewa Bands. The Nelson Act contained several provisions significantly different from the General Allotment Act. While the General Allotment Act provided individual members with certain proceeds from the sale of tribal land, the Nelson Act directed any profits derived from land sales into a collective permanent trust fund for the Minnesota Chippewa Band.

On February 15, 1909, Congress authorized the Court of Claims:

> to hear and determine a suit or suits to be brought by and on behalf of the Mille Lac [sic] Band of Chippewa Indians in the State of Minnesota against the United State [sic] on account of losses sustained by them or the Chippewas of Minnesota by reason of the opening of the Mille Lac [sic] Reservation . . . to public settlement under the general land laws of the United States.

35 Stat. 619, c. 126 (1909). The Mille Lacs Band filed suit pursuant to the 1909 Act to recover losses resulting from the 1889 Act. This suit was ultimately heard and resolved by the United States Supreme Court, which ordered an assessment of damages in favor of the Band. See United States v. Mille Lac Band of Chippewa Indians, 229 U.S. 498 (1913). Shortly after this decision, the United States purchased land for the Mille Lacs Band and made allotments to it and its members. The 4,000 acres purchased at that time are held in trust, and are not disputed here.

In 1990, the Mille Lacs Band filed a lawsuit which casts its

shadow over the present matter. By joining with several other Bands, they sought a declaratory judgment to establish entitlement to continued implied hunting and fishing rights originally guaranteed in the 1837 Treaty. Nine years later, the United States Supreme Court ruled in their favor, and in Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172 (1999), found that the 1837 Treaty protected the their hunting and fishing rights. Notwithstanding the finality of the Supreme Court's decision, there still remain a number of unresolved issues between the Mille Lacs Band and neighboring landowners.

It is also appropriate to recognize that, over the past few years, the Mille Lacs Band has opened two highly successful casinos, and has used revenues therefrom to acquire additional land. During this time, the Mille Lacs Band leaders have referred to a possible reassertion of their claim to land within the 1855 reservation boundaries. This claim has exacerbated relations between the Mille Lacs Band and its nearby neighbors, who brought this case. Plaintiffs ask the Court to declare that the Mille Lacs Band has no claim to any land beyond that which it occupies today.

II. Discussion

Defendants premise their motion to dismiss on four jurisdictional arguments. First, they claim plaintiffs lack standing to asset their claims. Second, they deny plaintiffs' claims are ripe for adjudication. Third, they claim sovereign

immunity bars the action. Fourth, they claim plaintiffs' failure to join the United States in this action is a failure to join an indispensable party.[4]

Before addressing the merits of their motion, the Court must consider the posture of the motion. The First National Bank of Milaca argues that dismissal, not summary judgment, is the proper remedy for a non-justiciable suit. Pl. Opp'n Mem. at 8 (citing Fed. R. Civ. P. 12(b)). While the Court agrees that if plaintiffs lack standing dismissal is the proper remedy, it finds defendants have properly raised justiciability arguments through their summary judgment motion. Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 329 (1999); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

Defendants are foreclosed from filing a motion to dismiss, having already interposed an answer. Fed. R. Civ. P. 12(b) ("A motion making any [12(b)] defenses shall be made before pleading if a further pleading is permitted."); see also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1361 (Supp. 2002) ("[M]otions raising [a lack of subject matter defense] may be considered by the court even when interposed after the responsive pleading has been filed, although technically [it is] no longer [a] Rule 12(b) motion[]."). Therefore, because a motion to dismiss is

[4]The Court finds it lacks subject matter jurisdiction and declines to rule on the latter two arguments.

procedurally barred, the Court employs the traditional summary judgment analysis to evaluate standing.

Under this rubric, plaintiffs must establish a genuine issue of material fact as to justiciability in order to survive summary judgment. Dep't of Commerce, 525 U.S. at 329 ("To prevail on a . . . motion for summary judgment - as opposed to a motion to dismiss - [] mere allegations of injury are insufficient. Rather, a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits."); Lujan, 504 U.S. at 561 ("Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.") (citations omitted).

A. Standing

The question of standing "involves constitutional limitations of federal court jurisdiction." Bennett v. Spear, 520 U.S. 154, 162 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). "To satisfy the case or controversy requirement of Article III, which is the irreducible constitutional minimum of standing, a plaintiff must, generally speaking, demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be

redressed by a favorable decision." Id. "In addition to constitutional requirements, standing also involves prudential limits on the exercise of federal jurisdiction." Rosebud Sioux Tribe v. McDivitt, 286 F.3d 1031, 1036 (8th Cir. 2002) (citing Bennett, 520 U.S. at 162).

Constitutional standing "assures that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982). "Absent specific facts establishing distinct and palpable injuries fairly traceable to [the defendants' conduct]" the injury in fact requirement is not satisfied. Ark. Acorn Fair Hous., Inc. v. Greystone Dev., Inc., 160 F.3d 433, 435 (8th Cir. 1998). Therefore, absent an actual controversy, the Court lacks jurisdiction. See Caldwell v. Gurley Ref. Co., 755 F.2d 645, 648 (8th Cir. 1985).

1. Law of the Case

First National Bank of Milaca claims the Court's inquiry into its standing is foreclosed by Magistrate Judge Noel's Order allowing it to intervene. The Bank asserts the Magistrate's ruling

established the binding "law of the case."[5] The Bank is incorrect; its position misconstrues the "law of the case."

The Bank cites a number of cases, including Klein v. Arkoma Prod. Co., 73 F.3d 779, 784 (8th Cir. 1996), to support its position. Klein, however, refers not to a magistrate's ruling vis-a-vis the district court hearing the case, but rather to the precedential effect of an appellate court's decision on the lower court when the matter is remanded. This case is entirely different.

If the Bank's argument is correct, this Court could never alter a magistrate's decision, or indeed, one of its own. To the contrary, it is clear that a district court may correct itself to avoid later reversal when convinced a decision "is clearly erroneous and would work a manifest injustice." Arizona v. California, 460 U.S. 605, 618 m.8 (1983); Lovett v. Gen. Motors Corp., 975 F.2d 518, 522 (8th Cir. 1992); 18 U.S.C. § 636 (granting district court judge's authority to reverse erroneous magistrate orders). In Lovett, the Eighth Circuit Court of Appeals upheld a district court's reconsideration of its own standing decision. See id. Because the law of the case doctrine applies only to issues decided by final judgments, id., the earlier decision did not bind the court. Here, the Magistrate did permit the Bank to intervene.

[5]Article III standing is a prerequisite to intervention. Standard Heating & Air Conditioning Co. v. City of Minneapolis, 137 F.3d 567, 570 (8th Cir. 1998).

But the law of the case does not bar this Court's consideration of the Bank's standing.

2. Do Plaintiffs Have Standing?

Constitutional standing requires that plaintiffs suffer some injury to justify the Court's entry of a declaratory judgment. Standing requires either actual or threatened injury. Babbitt, 442 U.S. 289, 292 (1979). "At the summary judgment stage the party invoking federal jurisdiction must have at least alleged specific facts that, taken as true, demonstrate the party suffered an injury in fact, that is one which is '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" Nat'l Fed'n for the Blind v. Cross, 184 F.3d 973, 979 (8th Cir. 1999) (citing Lujan, 504 U.S. 560-61).

Plaintiffs' primary claim arises out of threatened regulation by Mille Lacs Band ordinances.[6] The Court finds this claimed injury does not meet the constitutional requirement for standing; it is not actual, concrete, or imminent.

While actual enforcement of regulatory ordinances is not required by law, standing requires more than an "imaginary or

[6]See, e.g. 18 M.L.B.S.A. § 101 (requiring Band licensure to conduct business with the Band or within its jurisdiction); 24 M.L.B.S.A. §§ 3301-3309, 3501-3510 (setting debtor/creditor law); 11 M.L.B.S.A. § 9 (providing environmental protection regulations); 11 M.L.B.S.A. § 1002 (regulating waste disposal); 5 M.L.B.S.A. §§ 111(a)-(e), 113 (establishing general tribal court jurisdiction); 24 M.L.B.S.A. §2-6, 5 M.L.B.S.A. §§ 101, 111-13(asserting various areas of exclusive tribal court jurisdiction within the tribal lands).

speculative" fear of prosecution. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). An injury may involve past prosecution, United Food & Commercial Workers Int'l Union v. IBP, Inc., 857 F.2d 422, 427 (8th Cir. 1988), or the intent to engage in the exercise of a constitutionally guaranteed right, Doe v. Bolton, 410 U.S. 179, 188 (1973). See also Stoinaoff v. Montana, 695 F.2d 1214 (9th Cir. 1982) ("The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a controversy within the meaning of Article III."). In order to allege a cognizable injury, plaintiffs must demonstrate a realistic danger of enforcement by the Band.

In Steffel v. Thompson, the United States Supreme Court permitted a pre-enforcement First Amendment challenge to a law, but the law was a criminal statute. See 415 U.S. 452, 459 (1974). The Court limited potential prosecution claims to cases where the threat of prosecution is not imaginary, speculative, or chimerical. Id.; United Food, 857 F.2d at 425-30 (first amendment challenges to previously enforced criminal picketing statutes); High Ol' Times, Inc. v. Busbee, 621 F.2d 135, 138-39 (5th Cir. 1980) (first amendment challenge to a criminal statute). These cases, in contrast to the present case, uniformly involve chilled speech, an area traditionally afforded a high degree of constitutional protection. Plaintiffs point to neither an imminent threat of criminal prosecution nor to a history of past prosecution. The

ordinances about which they complain certainly present no threat to their right to free speech, or other fundamental rights.

Plaintiffs offer Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community, 991 F.2d 458 (8th Cir. 1993), to support their claim to standing. Their reliance is misplaced. Prairie Island is distinguishable on its facts. In Prairie Island, the Mdewakanton Sioux expressed its present intention to enforce a tribal ordinance regulating the transport of nuclear waste on an established reservation which houses a functioning nuclear electrical generation plant. Id. at 459. On those facts, Northern States Power could easily demonstrate an actual ongoing injury stemming from the ordinance, including delays in the shipping of hazardous nuclear waste and the inability to monitor the safety of a nuclear energy plant. See id. at 463. Prairie Island is not analogous to this case.

The Mille Lacs Band has neither threatened nor demonstrated an intention to enforce its ordinances beyond its 4000 acres. See Assoc. of Prop. Owners/Residents of Port Madison Area v. Individual Council Members of the Suquamish Tribal Council, C01-5317FBD, *4 (W.D. Wash. April 17, 2002) (finding no injury where tribe had not tried to enforce ordinance against plaintiff). The only shred of evidence supporting plaintiffs' claim of imminent enforcement is a March 23, 1992, letter from defendants concerning licensing. Defendants claim this letter was sent in error, and that licensing

is required only of those with whom the Mille Lacs Band, itself, does business.[7] Given that the Mille Lacs Band sent this letter more than 10 years ago, has run its licensing program for the past 11 years, and has never directly contacted either plaintiff, the Court finds the proffered letter wholly fails to demonstrate an immediate or certain threat of enforcement or injury. Absent a credible threat of enforcement, plaintiffs' claims are mere conjecture and do not give rise to standing. Brown-Outagamie-Oneida Jurisdiction Comm'n v. Powless, 85-C-1052 (E.D. Wisc. Sept. 28, 1990) (finding case not ripe where tribe had not attempted to enforce ordinance).

The text of the Mille Lacs Band ordinances similarly fails to prove pending enforcement. The only reference to the 1855 reservation is in the definitions section of the hunting, fishing, and wild rice ordinances. See 11 M.L.B.S.A. § 2001(n). This reference facially relates to the landmark Minnesota v. Mille Lacs Band of Chippewa Indians case. Such a limited reference is insufficient to indicate an intent to enforce all of the Mille Lacs Band ordinances on the land within the 1855 boundaries.[8]

---

[7]A similar letter, sent in 2001, expressly includes only those doing business with the tribe, see Pl. Ex. 18. This letter appears consistent with defendants' sworn statements. See Twait Dec. at 2; Big Bear Aff. at 1-2.

[8]Similarly, 11 M.L.B.S.A. § 9(e), which provides jurisdiction to enforce environmental regulations, is limited to the extent of United States law. As federal law largely proscribes the broad assertion of tribal jurisdiction over non-Indians, Nevada v. Hicks, 533 U.S. at 388-92, the Court will not construe this provision beyond both actual enforcement and its terms.

The County complains it has been injured in its ability to protect public safety, citing concerns over civil regulatory and traffic laws, and zoning regulations. It insists, therefore, that it needs this Court's clarification of tribal land boundaries.

The Tenth Circuit Court of Appeals considered this issue in Norvell v. Sangre de Cristo Dev. Co., Inc., 519 F.2d 370 (10th Cir. 1975), in which the State of New Mexico sought a declaratory judgment establishing the scope of its jurisdiction over a company operating on reservation land. Id. at 371-72. New Mexico claimed its "direct concern[] with the applicability of its laws and regulations not only as to the Company, but derivatively to the community of approximately 15,000 non-Indian persons who will ultimately live and do business in the non-Indian community" was sufficient to create an actual case or controversy. Id. at 374. The appellate court did not agree, holding that absent evidence that Indians were refusing to comply with state law, no case or controversy existed. Id. at 376-77. The same principle holds here; the County's mere interest in the proper enforcement of law and community safety does not provide standing. Id.

The Mille Lacs Band and its members have consistently complied -- however grudgingly -- with the County's zoning regulations and state traffic laws. The deposition testimony of the Mille Lacs County Sheriff, Dennis Boser, indicates the Mille Lacs Band has taken no actions which adversely affect the County's ability to

enforce state or county law, and that any legal conflicts which do exist have not harmed public safety. See Pl. Bank Ex. 7 at 14, 19, 47. Even assuming the Mille Lacs Band members obey the County's ordinances only "under protest," plaintiffs have not shown that their compliance "under protest" has created a real injury.[9] When examined, the County's position appears to be that the Court should hold that defendants' compliance with County law constitutes injury. The Court is unable to find any legal precept that can support this theory.

The County's concern over potential liability similarly affords no colorable claim. The County claims its potential liability stemming from law enforcement beyond its jurisdiction constitutes a cognizable injury. It supports this position by citing Ross v. Neff, 905 F.2d 1349 (10th Cir. 1990), in which a state police officer arrested an Indian in Indian Country in a non-Public Law 280 state. This arrest led to a civil rights case involving potential municipal liability. The Court finds Ross insufficient to support this claim.

It is clear that potential liability stemming from a filed complaint can be sufficient to create standing. See Va. Sur. Co.

---

[9]The cases cited by the County cannot be read to stand for this proposition. See, e.g., Altvater v. Freeman, 319 U.S. 359 (1943) (continued dispute over reissued patents gave rise to controversy); Atchison, Topeka & Sante Fe Railway Co. v. O'Connor, 223 U.S. 280, 285-87 (1912) (action to recover taxes paid under protest). Neither case is premised on a defendant's actual compliance with a law.

v. Northrup Grumman Co., 144 F.3d 1243, 1246 (9th Cir. 1998). On the other hand, an amorphous threat of future liability alone does not result in injury. If such an inchoate claim could support standing, a court could intervene whenever any entity faced the possibility of future litigation. See O'Shea v. Littleton, 414 U.S. 488, 497 (1974) (finding plaintiffs lacked standing to complain of an injury that would occur "if they proceed[ed] to violate an unchallenged law and if they [were] charged, held to answer and tried in any proceedings"); Caribbean Marine Serv. Co., Inc. v. Baldridge, 844 F.2d 668, 675 (9th Cir. 1988) (finding no standing where plaintiffs claim increased exposure to liability dependent on multiple contingencies); City of South Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency, 625 F.2d 231, 238-39 (9th Cir. 1980) (finding no standing where exposure to civil liability is speculative).

Here, the County's exposure to liability depends on the likelihood of its officers' violating the constitutional rights of Mille Lacs Band members by reason of municipal policy or custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). The Court has no evidence before it which suggests such an illegal policy is in place in Mille Lacs County. This scenario is scarcely the kind of risk upon which jurisdiction can be based. The Court must, absent evidence to the contrary, assume the County's law enforcement officers will continue to protect the citizenry and avoid

constitutional wrongs. The Court finds the County's proffered "threat of civil liability is too attenuated and conjectural to constitute a basis for standing." Caribbean Marine, 844 F.2d at 675.

Next, plaintiffs claim statements made by defendants regarding their rights under the 1855 Treaty have caused a loss or degradation of local real estate values. The Bank claims $11,000,000 in real estate loans have been jeopardized; the County claims a loss of property tax revenue and a potential diminution of resale value should it sell municipally-owned land. Plaintiffs offer these claims, underpinned by the affidavit of real estate appraiser Roger Wagner. The Court rejects this insubstantial evidence.

Mr. Wagner's affidavit lacks the foundation necessary to fulfill Rule 56(e)'s requirement that statements in reply to a motion for summary judgment "set forth such facts as would be admissible into evidence." The only "fact" underlying his opinion is a published advertisement identifying a piece of property as "outside the disputed boundaries." He offers neither statistical nor empirical evidence comparing land values within or without the 1855 reservation boundaries. He does not point to a single instance where the Bank has ever declined a mortgage or tendered one at a higher rate for property within or without those borders. The affidavit does not state that property values are lower in

Mille Lacs County compared to its surrounding neighbors either as a result of or in connection to any perceived risk. Plaintiffs' "expert" offers nothing other than conjecture to show that verbal sparing over the 1855 boundaries has caused any devaluation or decline in real estate values. Mr. Wagner presents no data or quantification as to the actual lost value caused by the dispute, but merely offers his personal belief that some effect has occurred.

The Court notes the 1855 reservation borders include much of Mille Lacs Lake and other highly desirable vacation, business, and residential property. Taking into account the historically strong interest in owning this lakefront property, and the absence of evidence of so much as a single sale where proximity to Indian Country affected price, the Court finds plaintiffs allege no injury or risk of future injury.

Setting aside the utter paucity of admissible evidence supporting this claim, there is another problem with this proffered jurisdictional theory. Even assuming plaintiffs have correctly described landowners' fears, any claimed diminution of land value would result from the disinterest of third-party potential-purchasers in owning land in the reservation -- not from legal uncertainty. The impact of this Court's decision depends, therefore, on actions of third-party property buyers and owners who are not parties to this litigation. See Lujan, 504 U.S. at 560-61

("there must be a causal connection between the injury and the conduct complained of - the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court"). Independent personal decisions on land value remain outside the control of the Court. Because this Court cannot affect buyers perceptions about the nature of title within a reservation - however unfounded - a decision on the merits will not redress these concerns.

Plaintiffs' devaluation argument also reflects confusion as to the nature of declaratory relief. Plaintiffs ask the Court to determine whether the 1855 reservation continues as a valid legal entity. The Court may decide the case as plaintiffs wish and find the reservation disestablished or diminished. But the Court could also make the contrary ruling and find the 1855 reservation a legally valid entity. If the Court were to do so -- and notably the defendants have <u>not</u> sought this finding -- the result could well solidify rather than ameliorate plaintiffs' fears. Plaintiffs' complaints stem then, not from uncertainty, but from fears and perceptions concerning an unfavorable decision on the lawsuit they have themselves initiated. This is not the kind of injury the law recognizes as conferring standing.

Before the Court will invoke its sweeping declaratory judgment power, it must preside over a live controversy. Here, plaintiffs

have not offered proof that such a controversy of constitutional dimension exists. The Court, therefore, cannot address the serious issues before it.

B. Ripeness

As an alternative, but certainly related basis, the Court finds this case is not ripe for adjudication. See U.S. Const. Art. III; see also United Food, 857 F.2d at 425-26 (applying ripeness to Declaratory Judgment Act). The ripeness doctrine precludes any decision on a legal or factual question absent "a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical and abstract." See Babbitt, 442 U.S. at 298 (quotations omitted). Ripeness requires "fitness of the issues for judicial decision" and examination of "the hardship to the parties of withholding court consideration." See Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967).

The Declaratory Judgment Act calls upon the Court to apply a heightened standard of ripeness, allowing judicial intervention only where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." See Lake Carriers Ass'n v. MacMullan, 406 U.S. 498, 506 (1972); Gopher Oil Co. v. Bunker, 84 F.3d 1047, 1050 (8th Cir. 1997) (citing Caldwell, 755 F.2d at 649). The Court's declaratory power is strictly discretionary, see Wilton v. Seven Falls Co., 515 U.S. 277, 282

(1995), and is to be exercised with caution.

The Court finds this litigation involves only hypothetical and speculative disagreements. See Cass County v. United States, 570 F.2d 737, 738 (8th Cir. 1978) (finding generalized claims of confusion over jurisdiction lack needed specificity). According to plaintiffs, legal uncertainty over tribal jurisdiction within the 1855 reservation boundaries has created an unbearable hardship requiring judicial action.[10] While the Courts have found uncertainty regarding legal status can justify judicial action in a limited number of cases, see, e.g., Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985), those cases involved a clear injury in the absence of judicial action. See id. (wherein regulation restricted access to jury trial). Here, any overlapping jurisdictional claims are highly conjectural, and a decision on these abstracted claims is unwarranted. See Cass County, 570 F.2d at 741-42 (connecting boundary decisions to disputes over taxing authority, criminal jurisdiction, and fishing and hunting rights

[10]Plaintiffs support this contention by pointing to Justice Souter's concurrence in Nevada v. Hicks, 533 U.S. 353, 383 (1995). That case involved a tribal court's assertion of jurisdiction over state actors in a § 1983 case. The language plaintiffs quote, however, comes from a portion of Justice Souter's opinion which urges ending any linkage of tribal jurisdiction from status. He argues that maintaining this connection creates an "unstable jurisdictional crazy quilt." Id. At best, the quoted language can be read as a call for bright-line rules governing subject matter jurisdiction for tribal courts. The Court cannot find in the Justice's quoted language any support for a requirement to resolve every possible dispute over land ownership or reservation status.

cases).

Plaintiffs cite a number of cases where courts have resolved land disputes through declaratory judgment, but none of them are analogous to this case. In each of the cited cases, there were concrete and specific incidents involving reservation boundaries and sovereignty. See id.; Yankton Sioux Tribe v. South Dakota, 796 F.2d 241 (8th Cir. 1986) (conversion and declaratory action arising from non-Indian harvesting on a reservation lake).

Plaintiffs ask the Court to focus on the Rosebud Sioux Tribe litigation. See Rosebud Sioux Tribe v. Kneip, 375 F. Supp. 1065 (D.S.D. 1974), aff'd 521 F.2d 87 (8th Cir. 1975), aff'd 430 U.S. 584 (1977). That suit sought a declaration of the original reservation boundaries intact after the defendant county exercised both civil and criminal jurisdiction over tribe members. 375 F. Supp. at 1066; 430 U.S. at 585. In City of New Town v. United States, 454 F.2d 121 (8th Cir. 1972), plaintiff, a North Dakota municipality, sought declaratory relief in the wake of particularized challenges to municipal authority. Even if plaintiffs have tracked the pleadings filed in those cases, their having done so does not make this dispute ripe. The distinction is pristine: Rosebud Sioux and City of New Town presented ripe factual disputes; this one does not. The cited cases involved explicit efforts by one sovereign to exercise particular powers beyond their lawful jurisdiction; they did not present abstracted

concerns over reservation boundaries.

Plaintiffs offer a laundry list of problems and fears they feel are related to the possible existence of the 1855 reservation boundaries, and suggest these make this case ripe for adjudication. Their list includes greater regulatory authority under the EPA and National Historic Preservation Act, limits on county and state regulatory authority, and an expansion of the reach of tribal authority and sovereignty should the 1855 boundaries be in place. This litany of concerns misapprehends ripeness. If the Band's tribal authority covers the full extent of the 1855 reservation, it might well alter private and public sector relationships in the Mille Lacs area. The mere fact that a decision will be momentous does not, however, make this the proper time to render it.

Similarly, the ordinances examined above do not provide evidence of hardship. Simply put, in the absence of any immediate or impending concrete injury -- where plaintiffs lack standing -- any hardship caused by delayed review is conjectural. Plaintiffs claim the mere possibility that the Mille Lacs Band might try to enforce its ordinances is a valid ongoing threat, even if the ordinances have never been enforced. As explained, the law permits declaratory relief in a limited number of circumstances where enforcement is pending. Those circumstances are not present here; the parties are not faced with a choice between protected conduct and a risk of sanction. <u>See</u> <u>Caldwell</u>, 755 F.2d at 650 (stating the

"threat of enforcement must have immediate coercive consequences" in order to intervene before regulatory action).

Ripeness is a question of timing. This Court will not exercise its declaratory judgment authority to interpret treaties and decide grave questions regarding reservation disestablishment in the absence of a real dispute. Plaintiffs have failed to demonstrate why this Court should exercise its authority at this time. Accordingly, the Court lacks jurisdiction over this dispute.

III. Conclusion

It is axiomatic that federal court jurisdiction is limited. A justiciable case or controversy is central to the constitutional constraints on a federal court's ability to act. The Court has found plaintiffs lack standing to bring their claims and, alternatively, their claims are not yet ripe for adjudication.

Accordingly, IT IS ORDERED that:

1. Defendants' motion [Docket No. 31] is granted.

2. Plaintiffs' motion to strike [Docket No. 54] is dismissed as moot.

3. This case is dismissed with prejudice.

Dated: May 6, 2003

JAMES M. ROSENBAUM
United States Chief District Judge